# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT W. RODRIGUEZ,

*Plaintiff,*

v.

VIRGINIA S. PENROD,

*Defendant.*

Civil Action No. 1:18-cv-00240 (CJN)

## MEMORANDUM OPINION

Lieutenant Colonel Robert W. Rodriguez, U.S. Army (retired), was an officer in the New York Army National Guard in the 1990s. Compl. ¶ 1, ECF No. 4. Near the end of his career Rodriguez blew the whistle on certain personnel accounting techniques that had the effect of overstating the number of soldiers in active service (and thereby inflating the Guard's budget requests). *Id.* ¶ 14. He alleges that he was then subjected to illegal retaliation and forced to retire. *Id.* ¶¶ 2, 14–24. More than two decades later, he continues to litigate the aftermath of those events. In this Court, he challenges the Defense Department's decision on the appeals of his administrative petition before the Army Board for Correction of Military Records, on both procedural and substantive grounds, under the Administrative Procedures Act (APA), 5 U.S.C. § 706. *See generally* Compl. Before the Court are the Parties' Cross-Motions for Summary Judgment. *See* Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 13; Pl.'s Mot. for Summ. J., ECF No. 14. The Court finds that the Department's action on Rodriguez's appeal was adequate under the APA and therefore grants summary judgment to Defendant.

# I.    Background

Rodriguez was commissioned in the Army Reserve in 1971 and served in a variety of positions over the next two decades.  *See* Army Board for Corrections of Military Rs. R. of Proceedings of Aug. 5, 2010 ("First Board Decision") at 4–5, Pl.'s Deferred App'x ("D.A.") 522–23.[1]  In 1994 he assumed command of the 1st Battalion, 105th Infantry Regiment.  *Id.* at 5, D.A. 523.  He was promoted to the rank of lieutenant colonel on December 19, 1994.  *Id.*  In 1996, Rodriguez's commander, Colonel Dale Barber, relieved him of command because Rodriguez's battalion arrived at a summer training exercise with nearly 15% fewer soldiers than expected.  Col. Barber's Mem. of Aug. 11, 1996, D.A. 206.  Shortly thereafter, Rodriguez made a report to the New York Army National Guard's Inspector General and subsequently contacted the State's Adjutant General.  Pl.'s Mem. of August 14, 1996, D.A. 207.  Rodriguez was reassigned to an administrative position pending further action.  First Board Decision at 9, D.A. 527.

Later that year, Major General Robert Rose, who was then the New York Guard's Commanding General, issued Rodriguez a letter of reprimand.  Maj. Gen. Rose's Mem. of Oct. 16, 1996, D.A. 217.  The letter purported to justify Rodriguez's relief from command as the "direct result of [his] failure to control the AWOLs and [his] lack of attention to strength maintenance throughout the battalion."  *Id.*; First Board Decision at 8–10, D.A. 526–28.  Around that time, Rodriguez submitted a request for redesignation as a logistics officer, but the Guard denied his request.  First Board Decision at 10, D.A. 528; LTC Charles H. Hall's Mem. of Oct. 8, 1996, D.A. 212.

---

[1] All citations to Plaintiff's Deferred Appendix are to ECF Nos. 4-5, 4-6, and 4-7.

The following year, Rodriguez retired as a lieutenant colonel. *See* DA Form 4187 (signed Nov. 23, 1997), D.A. 236; Addendum to DA Form 4187 (Nov. 25, 1997), D.A. 237. The retirement forms indicated that Rodriguez had the option to seek reassignment to another Guard or Reserve position, to transfer to the Individual Ready Reserve and retain basic benefits, or to retire with "Special Separation Pay." DA Form 4187, D.A. 236. By opting for retirement, Rodriguez received an unspecified amount of separation compensation. *Id.* However, Rodriguez manually noted on the form that he "reserve[d his] rights to request reinstatement [under] applicable [Department of Defense] regulations and any other authority." *Id.*

Rodriguez made several requests for investigations into the circumstances of his relief from command and the denial of his redesignation, including with the State Adjutant General's Office, the Department of the Army Inspector General, and the Defense Department Inspector General's hotline. First Board Decision at 9, 11, 13, D.A. 527, 529, 531. The Adjutant General's investigations uncovered no wrongdoing. *Id.* at 12, D.A. 530. But the Army Inspector General determined that General Rose's letter of reprimand was, in fact, an illegal reprisal for Rodriguez's having engaged in protected communications under the Military Whistleblower Protection Act, 10 U.S.C. § 1034. U.S. Army Inspector General Agency Report of Investigation, Case No. 35-97, Mar. 13, 1998 ("1998 Inspector General Report") at 2, D.A. 240. The Defense Department's Inspector General notified Rodriguez that he was eligible to petition the Board for Correction of Military Records to remove the letter from his record and provided information on how to submit the petition. M. Jane Deese's Ltr. of Sep. 17, 1998, D.A. 300–01.

The following year, the Army Inspector General issued an addendum to its report purporting to consider new evidence provided by General Rose and withdrawing its characterization of the letter of reprimand as a retaliatory action under the Whistleblower Act.

*See* U.S. Army Inspector General Addendum to Report of Investigation, Case No. 35-97, Dec.

30, 1999 ("1999 Inspector General Report") at 21, D.A. 330 ("The preponderance of evidence

established that BG Rose did not reprise against LTC Rodriguez since the [letter of reprimand]

against LTC Rodriguez was initiated prior to LTC Rodriguez's protected communication.").  The

1999 Inspector General Report bore the signatures of Army Inspector General Lieutenant

General Michael W. Ackerman (concurring) and Vice Chief of Staff General John M. Keane

(approving).  *Id.* at 22, D.A. 331.

Rodriguez chose not to take his case to the Board, so the affair seemed to be at an end.

*See* Rick A. Schweigert's Ltr of. May 15, 2000, D.A. 333 (indicating that LTC Rodriguez had

not petitioned for correction of his record).  Rodriguez made that decision in part because, prior

to his retirement (and before the publication of either Inspector General Report), Guard officials

assured him that all letters of reprimand had been removed from his Official Military Personnel

File, so there was no need to take further action.  *See* Pl.'s Ltr. of Sep. 27, 2009 at 3, D.A. 365.

Investigations into the Army National Guard's method of accounting for its personnel continued,

resulting in congressional reports finding that the Guard was overstating its size and therefore

regularly inflating its budget requests.  *See generally* U.S. Gov't Accountability Office, GAO-

02-540R, Military Personnel Strengths in the Army National Guard (2002), D.A. 334–39.

In 2005, Rodriguez came under consideration for appointment to a senior civilian

position within the Department of the Army.  Pl.'s Ltr. of Sep. 27, 2009 at 1, D.A. 363.  The FBI

investigator charged with vetting him for the position inquired about a letter of reprimand in his

Official Military Personnel File—the same letter General Rose issued him after his relief from

command and that the Army Inspector General had found constituted illegal reprisal (though that

opinion was later retracted).  *Id.*  Rodriguez believed that someone in the Guard placed the letter

in his file after he retired in an effort to sabotage his future employment opportunities. *Id.* at 4, D.A. 366.

## II.    Procedural History

### A.    Army Board for Correction of Military Records Proceedings

In light of that discovery and after he left his senior position in the Department of the Army, in 2009 Rodriguez petitioned the Army Board for Correction of Military Records for relief. *See generally* Pl.'s Ltr. of Sep. 27, 2009, D.A. 363–91.  In addition to a request that the Board consider his application for relief timely (despite submitting it over a decade after he retired), Rodriguez sought several forms of relief:  removal of the letter of reprimand from his official file; removal of Officer Evaluation Reports (which, he alleged, contained negative performance evaluations and formed part of the retaliation against him) and insertion of a favorable Officer Evaluation Report that was missing from his record; a retroactive declaration that he had graduated from the Army War College, with accompanying professional credit and retirement benefits (because he claimed he would have been selected to attend the school as a follow-on tour had he not been improperly removed from command); reinstatement to active status (so as to enable further relief); a retroactive award of backpay and retirement credit; and, most notably, retroactive promotion to the rank of colonel with backpay (which, Rodriguez alleged, he would have attained but for the illegal reprisal).  *Id.* at 24–29, D.A. 386–91. Rodriguez attached six supporting letters from general officers and other officials attesting to the wrongfulness of the actions against him and the quality of his service prior to retirement.  *Id.* at 30, D.A. 392.

The Board requested an advisory opinion from the National Guard Bureau and the New York Army National Guard.  First Board Decision at 21, D.A. 539.  Their opinion recommended that the Board remove the letter of reprimand from Rodriguez's file but otherwise deny relief.

*Id.* The Board provided Rodriguez a copy of the advisory opinion and gave him an opportunity to comment on it. *Id.* He submitted a 116-page rebuttal in which he raised at least thirteen flaws in the opinion, including accusing the Bureau and the Guard of colluding to harm him, questioning both the authority and the neutrality of the Guard officer assigned to the case, and attacking the Bureau's procedures for handling and issuing advisory opinions. *Id.* at 22–23, D.A. 540–41.

The Board released its voluminous report nearly a year later. *See generally id.* It reviewed each of Rodriguez's allegations in detail and concluded that he was entitled only to partial relief. *Id.* Although servicemembers must typically petition for relief within three years of the alleged error, 10 U.S.C. § 1552(b), the Board decided to waive the limitations period "in the interest of justice" for the limited purpose of reviewing the unexplained presence of the letter of reprimand in Rodriguez's official file. First Board Decision at 3, D.A. 521. It made that determination on the basis both of the letter's late discovery by the FBI in 2005 and Rodriguez's service as a senior DOD official from 2007–2009, which may have precluded him from addressing issues with his personal record during that timeframe. *Id.* at 3, 36, D.A. 521, 554. But the Board declined to waive the timeliness requirement for the remainder of Rodriguez's claims, as he had ample knowledge of them since the late 1990s, admitted that he intended to petition for relief then but got sidetracked by his civilian career, and then waited more than ten years before pursuing relief. *Id.*

But even though it concluded that these claims were time-barred, the Board proceeded to evaluate each on the merits and explained its decision for granting or denying each request. It granted partial relief and ordered the removal of the 1996 letter of reprimand from Rodriguez's personnel file. *Id.* at 28, D.A. 546. The Board concluded that General Rose had failed to review

or consider Rodriguez's rebuttal letter or affirmatively place the letter of reprimand in Rodriguez's file, so its presence (notwithstanding its later removal and subsequent replacement) was improper. *Id.*

That's as far as the Board was prepared to go. It declined to order the missing Officer Evaluation Report to be placed in Rodriguez's file because the report did not comply with applicable Army regulations. *Id.* at 29, D.A. 547. It did not order the removal of the Reports already in Rodriguez's file, despite acknowledging that they were administratively flawed, because the 1998 Inspector General Report had not substantiated Rodriguez's claim that they constituted reprisal; Rodriguez could not show any harm to his career resulting from the reports; and he had failed to appeal them in a timely fashion despite being aware of the appeals procedure at the time.[2] *Id.* at 28–30, D.A. 546–48. The Board declared that the denial of his application for designation as a logistics officer was correct because Rodriguez did not meet the minimum qualifications and because Rodriguez had submitted no evidence that General Rose illegally tampered with or influenced the denial. *Id.* at 30–31, D.A. 548–49. The Board denied his request for retroactive promotion to colonel (or consideration by a special selection board to evaluate whether he merited such a promotion) because Rodriguez retired before he was ever considered for promotion, making him ineligible for retroactive promotion under applicable regulations. *Id.* at 31, D.A. 549. The Board determined that it lacked authority to grant credit for completion of the Army War College or other backpay because Rodriguez never performed such service. *Id.* And the Board concluded that Rodriguez was not constructively discharged because

---

[2] Despite the Board's decision not to remove the Officer Evaluation Reports, Catherine Mitrano, Deputy Assistant Secretary of the Army for Army Review Boards, later overruled the Board and ordered the reports removed from Rodriguez's record and replaced with an indication that Rodriguez was not rated due to no fault of his own. *See* Dep. Ass't Sec'y Mitrano's Mem. of Aug. 10, 2010, D.A. 175–76.

he voluntarily selected retirement from among a range of options, some of which would have permitted him to remain in service, so it was unable to grant his request for vacatur of his retirement and reinstatement to active service. *Id.* at 31–32, D.A. 549–50.

Finally, the Board addressed Rodriguez's many criticisms of the Army's procedures for handling his whistleblower complaints and Board petition. *Id.* at 32–36, D.A. 550–54. It was only in this section of the Board's decision that it discussed the 1999 Inspector General Report, which had revised the findings of the 1998 Report and concluded that even the 1996 letter of reprimand did not constitute illegal reprisal against Rodriguez. *Id.* The Board questioned why Rodriguez never mentioned the 1999 Report in his submissions to the Board despite being aware of its existence, *id.* at 32–33, D.A. 550–51, but it determined that the question was irrelevant because the reprimand letter had been removed from his file before his retirement, so it played no role in his decision to retire and therefore caused him no harm. *Id.* at 33, D.A. 551. The report ultimately concluded that:

> The primary basis for [Rodriguez's] contention is that he was wrongfully reprised against by certain individuals within the [New York Guard]. The [Department of the Army Inspector General] found all his allegations unsubstantiated. Aside from removing the [letter of reprimand] that was inadvertently placed in his [personnel file], relief is not in order.

*Id.* at 36, D.A. 554. The letter accompanying the Board's decision specified that Rodriguez had a right to request reconsideration within one year.

Not to be deterred, Rodriguez continued his investigation of the events surrounding his retirement. Believing the 1999 Inspector General Report to have been flawed, he contacted General Jack Keane, who was the Vice Chief of Staff of the Army in 1999 and whose signature appeared on the final page of the report as the approving official. *See* 1999 Inspector General Report at 22, D.A. 331. General Keane indicated that he did not recognize the signature—in

fact, it misspelled his name.  *See* Gen. Keane's Email of Dec. 14, 2011, D.A. 575.  Rodriguez

promptly petitioned the Board for reconsideration on the basis of newly discovered evidence:

the 1999 Inspector General Report, he claimed, was forged.  *See* Pl.'s Ltr. of Jan. 3, 2012, D.A.

120.  In addition to the new evidence, Rodriguez submitted a 53-page memorandum alleging

flaws in the Board's original decision.  *See* Pl.'s Mem. in Supp. of Req. for Recons., D.A. 121–

173.

The Board granted the request for reconsideration.  *See generally* Army Board for

Corrections of Military Rs. R. of Proceedings of Apr. 18, 2012 ("Second Board Decision"), D.A.

113–119.  It acknowledged the possibility that the 1999 Inspector General Report was falsified

and agreed to exclude that document from its decision.  *Id.* at 5, D.A. 117.  But it repeated its

earlier conclusions that Rodriguez was ineligible for retroactive promotion to colonel because he

did not meet the regulatory criteria, pointed out once again that Rodriguez chose to retire rather

than to remain in active service (and thereby give himself an opportunity to be promoted), and

waited a decade before seeking relief.  *Id.* at 6, D.A. 118.  The exclusion of the 1999 Inspector

General Report did not change those conclusions.  *Id.*  The Board therefore declined to amend its

earlier decision to grant only partial relief.  *Id.* at 7, D.A. 119.

## B.     Administrative Appeal

Frustrated with the Board's decisions, Rodriguez sought to appeal within the Defense

Department.  He appealed first to the Secretary of the Army, who was required to "issue a final

decision with respect to [Rodriguez's] application [for relief] . . . within 180 days after the

application [was] filed."  10 U.S.C. § 1034(g)(4).  The Secretary took no action on the Board's

report, so it was automatically deemed final under the statute once the 180-day mark passed.  *Id.*

Having exhausted his administrative remedies within the Department of the Army,

Rodriguez then appealed to the Secretary of Defense under § 1034(h).  *See* Pl.'s Ltr. of Sep. 28,

2012, D.A. 77.  In support of his appeal, he attached a thirty-five-page memorandum of law, along with various exhibits and supporting documents.  *See generally* Pl.'s Mem. of Law in Supp. of Appeal to Sec'y of Def. ("Pl.'s Mem."), D.A. 78–112.  Rodriguez supplemented his application the following month to provide records relating to what he believed was an analogous case, in which the Air Force Board for Correction of Military Records recommended retroactive promotion for a lieutenant colonel who was improperly relieved of command and was not selected for advancement.  *See* Pl.'s Ltr. of Oct. 22, 2012, D.A. 56–58 (citing R. of Proceedings, Air Force Board for Correction of Military Rs., No. BC-2004-00976 (2004) ("Air Force Board Decision"), D.A. 59–70).

The Military Whistleblower Protection Act directs the Secretary of Defense to "make a decision to reverse or uphold the decision of the Secretary [of the Army] within 90 days after receipt" of a whistleblower's appeal.  10 U.S.C. § 1034(h).  But the Secretary delegated that authority, which was further delegated down several times until the authority purportedly came to rest with Pasquale M. Tamburrino, a member of the Senior Executive Service who was then serving as Chief of Staff to the Under Secretary of Defense for Personnel and Readiness.  *See* USD(P&R) Action Memo of Dec. 14, 2012 ("Action Memo"), D.A. 54–55.  Tamburrino issued a one-page decision on January 28, 2013, which he addressed to Plaintiff's counsel but in which he inadvertently referred to Plaintiff as "Lt Col Roger F. Reynolds."  *See* Tamburrino's Ltr. of Jan. 28, 2013, D.A. 41.  This letter summarily declared that Tamburrino had "considered all of the materials [Rodriguez] submitted to [him], the [Army Board for Correction of Military Records], and the materials the [Board] examined in reaching a decision in [Rodriguez's] case," and that he "[did] not find that the Board acted arbitrarily, capriciously, contrary to law, or that its

determination was unsupported by substantial evidence." *Id.* Tamburrino upheld the decision "on behalf of the Secretary of Defense" and indicated that his action was final. *Id.*

Rodriguez replied to point out (1) that his name is not Roger Reynolds (an understandable point) and (2) that the Department of Defense Directive governing Military Whistleblower Protection Act appeals did not authorize the Chief of Staff to the Under Secretary of Defense for Personnel and Readiness to make such decisions on the Secretary's behalf. *See* Pl.'s Ltr. of Feb. 27, 2013, D.A. 33–37 (citing Department of Defense ("DOD") Directive 7050.06, Military Whistleblower Protection (Jul. 23, 2007)). Rodriguez also noted that the decision contained no reasoned explanation for upholding the Board's decision, and he requested that Tamburrino vacate his decision and forward the appeal to the appropriate official designated under DOD Directive 7050.06. *Id.* at D.A. 33–36.

Tamburrino responded on April 11 (naming the correct petitioner this time). Tamburrino's Ltr. of Apr. 11, 2013, D.A. 31. He explained that he had appropriately been designated as the successor to the former position authorized to handle Military Whistleblower Protection Act appeals (but which had since been eliminated in a departmental reorganization) and so was the correct official to handle Rodriguez's appeal. *Id.* Tamburrino also noted that he regretted the clerical error that incorrectly listed Rodriguez's name. *Id.* He then repeated nearly verbatim his conclusion summarily upholding the Board's decision without addressing Rodriguez's request for his reasoning. *Id.*

### C. Judicial Review and Further Administrative Action

The next month, Rodriguez petitioned in the D.C. Circuit for judicial review of Tamburrino's decision. *See generally* Petition for Review, *Rodriguez v. Tamburrino*, No. 13-1192 (D.C. Cir. May 31, 2013), ECF No. 1439585. But after the Parties went to mediation, Rodriguez agreed to dismiss his petition in exchange for vacatur of Tamburrino's decision and

remand to the Department of Defense for reconsideration. *See generally* Petitioner's Consent

Mot. for Voluntary Dismissal Without Prejudice, *Rodriguez v. Tamburrino*, No. 13-1192 (D.C.

Cir. May 19, 2014), ECF No. 1493616; *see also* Order, *Rodriguez v. Tamburrino*, No. 13-1192

(D.C. Cir. Jul 31, 2014), ECF No. 1505481 (granting Rodriguez's motion for voluntary

dismissal).

By that point, Tamburrino had left his role as Chief of Staff and had been replaced by

Virginia Penrod, the Defendant here. Rodriguez submitted a five-page read-ahead memorandum

briefly explaining his argument. *See generally* Pl.'s Ltr. of Sep 25, 2014, D.A. 6–10. Assisted

by counsel, he then personally met with Penrod (assisted by counsel) to make his case. *See*

Def.'s Ltr. of Mar. 6, 2015 ("Penrod Decision") at 1, D.A. 1. Six months later, Penrod issued a

five-page decision upholding the Board's ruling. *See generally id.*, D.A. 1–5. Unlike

Tamburrino's letters, Penrod's decision contained short but reasoned conclusions addressing

Rodriguez's arguments. *See generally id.*

Rodriguez again sought review in the D.C. Circuit. *See generally* Petition for Review,

*Rodriguez v. Penrod*, No. 15-1096 (D.C. Cir. Apr. 2, 2015), ECF No. 1547734. During briefing,

then-Secretary Ashton Carter specifically delegated his authority under the Military

Whistleblower Protection Act to Dr. Jonathan Woodson, the Assistant Secretary of Defense for

Health Affairs in the Office of the Under Secretary for Personnel and Readiness, for the purpose

of reviewing "*de novo* the relevant decision of Ms. Penrod and the request from LTC Rodriguez,

including the entire administrative record in [the] case[] and issu[ing] a decision on [his] behalf."

Sec'y Carter's Ltr. of Mar. 9, 2016, ECF No. 14-9 at 7. The following day, Woodson issued a

one-page letter informing Rodriguez that he had begun conducting the review on March 4 "[i]n

anticipation of [Carter's] delegation of authority," that he had "carefully considered" the

administrative record, and that he found "the decision by the Army Board for Correction[] of Military Records . . . was not arbitrary, capricious, or contrary to law, and it was supported by substantial evidence." Asst. Sec'y Woodson's Ltr. of Mar. 10, 2016 ("Woodson's Decision"), ECF No. 14-9 at 5. Woodson expressly adopted the reasoning of both the Board and Penrod, denied Rodriguez's appeal, and declared his action final. *Id.* The Department filed a letter notifying the Court of its action on the same day that it filed its merits brief. Def.'s Ltr. of Mar. 10, 2016, ECF No. 14-9 at 1.

Rather than reaching the merits, the D. C. Circuit held that it lacked jurisdiction to hear the petition. *See Rodriguez v. Penrod*, 857 F.3d 902, 905–07 (D.C. Cir. 2017). Because the Military Whistleblower Protection Act does not expressly provide for judicial review by the courts of appeals, the appropriate forum for Rodriguez's claims was the district court. *Id.* at 906 ("[T]he normal default rule is that persons seeking review of agency action go first to a federal district court." (internal quotations omitted)). The Court of Appeals transferred the case to this Court under 28 U.S.C. § 1631, *id.* at 907, and the Parties then filed Cross-Motions for Summary Judgment.

### III.    Legal Standard

Under the APA, the Court has a "limited role . . . in reviewing the administrative record." *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007). "[I]t is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Id.* (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985)). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency

action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

The first step, then, is to determine what action is under review—and the Parties disagree about (or are unsure of) the answer to that question. The Department asserts that, as in other petitions for review of military corrections board actions, the Court reviews the decision of the Board, which is "reviewable under the 'arbitrary and capricious' standard of APA § 706." *Coburn v. McHugh*, 679 F.3d 924, 929 (D.C. Cir. 2012) (quoting *Kreis v. Sec'y of the Air Force* (*Kreis I*), 966 F.2d 1508, 1513 (D.C. Cir. 1989)); *see also* Def.'s Mot. at 15–17. In those cases, the Court is "guided by the 'strong but rebuttable presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith.'" *Id.* (quoting *Frizelle v. Slater*, 111 F.3d 172, 177 (D.C. Cir. 1997)).

Rodriguez, in contrast, argues that the Court is not reviewing the Board's decision, but rather Penrod's action alone. *See* Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mot.") at 14–16, ECF No. 14-1. To that end, Rodriguez's arguments all criticize Penrod's decision rather than the Board's: that her appointment was unlawful; that her decision was insufficiently reasoned; and that her decision involved various procedural defects. *See generally id.* Rodriguez characterizes his petition for judicial review as "a case of first impression under the [Military Whistleblower Protection Act]" and asserts that "other than APA case law in analogous situations, there is no known precedent discussing the standard for this Court's review of a Secretary of Defense final decision under the [Act]." *Id.* at 14. He therefore argues that the task before this Court is "to apply a non-deferential *de novo* standard of review . . . , guided by the APA case law." *Id.* at 16.

To reach that result, Rodriguez selectively quotes from a host of D.C. Circuit cases reviewing the decisions of military records boards. *See, e.g.*, *Coburn*, 679 F.3d at 929 ("First, on review of a district court's grant of summary judgment in connection with the appeal of a decision of the [Board], we review the [Board's] decision *de novo*, applying the same standards as the district court." (internal quotations omitted)). But Rodriguez's argument confuses the task of a court of appeals with the role of a district court. In each of the cases to which Rodriguez cites, the court of appeals conducted a de novo review by giving no deference *to the opinion of the district court* that had reviewed the agency's action in the first instance. *See id.* ("In other words, we 'do not defer to a district court's review of an agency [action] any more than the Supreme Court defers to a court of appeals' review of such a decision.'" (quoting *Novicki v. Cook*, 946 F.2d 938, 941 (D.C. Cir. 1991))). The standards of review between and among courts are different from the standard the APA generally requires courts to apply to their review of the actions of administrative agencies. Regardless of which decision constitutes the final agency action the Court reviews, the task is to decide whether to "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review" under that standard "is narrow and a court is not to substitute its judgment for that of an agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Because Rodriguez insists that he seeks review of Penrod's decision, and not the Board's decision, the Court will consider Penrod's decision of March 6, 2015, as the final agency action under review. *See* Pl.'s Reply to Def.'s Resp. in Further Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Reply") at 2, ECF No. 20 ("[T]his suit is brought against Penrod who purported to make a decision on behalf of the Secretary of Defense. While her decision is related to the

appropriateness of the [Board's] decisions, the Complaint alleges Penrod's numerous actions and failures to act.").  For that reason, the Court will confine its inquiry to the lawfulness of Penrod's handling of Rodriguez's appeal under the Military Whistleblower Protection Act.  That distinction ultimately makes no meaningful difference because Penrod's decision referenced and incorporated much of the Board's reasoning.  *See generally* Penrod Decision.

To the extent that Rodriguez challenges questions of law, such as the legality of Penrod's appointment, the Court must make a de novo determination.  *See* 5 U.S.C. § 706 ("To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law [and] interpret constitutional and statutory provisions.").  But to the extent that Rodriguez challenges the merits of Penrod's decision, "it is generally understood that 'decisions regarding the correction of military records are reviewable under the 'arbitrary and capricious' standard of APA § 706." *Coburn*, 679 F.3d at 929 (quoting *Kreis I*, 866 F.2d at 1513).[3]  The Court "must be able to conclude that [Penrod] 'examine[d] the relevant data and articulate[d] a satisfactory explanation for [her] action including a rational connection between the facts found and the choice made.'" *Kreis II*, 406 F.3d at 686 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). "Military boards are entitled to even greater deference than civilian administrative agencies . . . to ensure that the courts do not become a forum for appeals by every soldier dissatisfied with his or her ratings, a result that would destabilize military command and take the judiciary far afield

---

[3] Rodriguez argues that a later D.C. Circuit opinion, *Kreis v. Sec'y of the Air Force* (*Kreis II*), 406 F.3d 684, 686 (D.C. Cir. 2005), abrogated *Kreis I* and so the Department's reliance on *Kreis I* for the proposition that military administrators are entitled to some deference is misplaced. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") at 4–5, ECF No. 16.  But *Kreis II* made no mention of overruling *Kreis I*; in fact, *Kreis II* cited the prior decision, as have later D.C. Circuit opinions. *See, e.g.*, *Coburn*, 679 F.3d at 930 (quoting *Kreis I*, 966 F.2d at 1513).  *Kreis II* distinguished *Kreis I* on the question of whether to give deference to the Board's conclusions because of the differing procedural postures in the two cases, 406 F.3d at 686, but *Kreis I* appears to remain good law.

of its areas of competence." *Escobedo v. Green*, 602 F. Supp. 2d 244, 248–49 (D.D.C. 2009) (internal citation omitted) (quoting *Cone v. Caldera*, 223 F.3d 789, 793 (D.C. Cir. 2000)).

## IV.    Analysis

Rodriguez groups his many criticisms of Penrod's decision into three broad categories. First, he claims that permitting Penrod (rather than one of her superiors) to handle the appeal violated Department of Defense regulations, several statutes, and the Appointments Clause of the Constitution. Mot. at 16–20. Second, he contends that the Department's entire process for handling Military Whistleblower Protection Act appeals is ineffective and contrary to law. *Id.* at 26–34. Third, he argues that Penrod's decision lacked a satisfactory explanation of her reasoning, rendering it impossible for a reviewing court to uphold. *Id.* at 20–26. His initial brief on summary judgment raised no fewer than eight issues, and more arose in the course of briefing. *See generally id.* This sort of "kitchen sink" approach to advocacy is disfavored and "consumes space that should be devoted to developing the arguments with some promise." *Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000); *see also Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017) ("Effective appellate counsel should not raise every nonfrivolous argument on appeal, but rather only those arguments most likely to succeed."). Nevertheless, the Court evaluates each issue in turn.

### A.    Woodson's Appointment Cured Any Appointment or Delegation Error

The Military Whistleblower Protection Act insulates military whistleblowers from retaliation by their superiors. 10 U.S.C. § 1034. It outlines several categories of protected communications and several remedies for whistleblowers alleging retaliation. *Id.* Section 1034(g) lays out the procedures available to whistleblowers to correct their records after they leave the service if they experienced adverse retaliatory actions while still active. In the Army's case, the section authorizes the Army Board for Correction of Military Records to receive such

applications for relief, requires the Board to review any applicable Inspector General reports, provides military counsel for the applicant if needed, and directs the Secretary of the Army to review and confirm or reject the Board's decision within 180 days. § 1034(g). Once an applicant has exhausted those remedies, "if not satisfied with the disposition of the matter, [he] may submit the matter to the Secretary of Defense. The Secretary shall make a decision to reverse or uphold the decision of the Secretary [of the Army] within 90 days after receipt of such a submittal." § 1034(h). The statute authorizes the Secretary of Defense to issue implementing regulations. *Id.* § 1034(i).

As in most contexts, a senior official "must delegate most of his functions if they are to be performed at all." *Raley v. Porter*, 156 F.2d 561, 561–62 (D.C. Cir. 1946). The process of how the Secretary's authorities under the Act came to rest with the Chief of Staff to the Under Secretary for Personnel and Readiness, however, is convoluted. In 2007, Secretary of Defense Robert Gates authorized Deputy Secretary of Defense Gordon England to exercise all of the Secretary's legal authorities. DOD Directive 5105.02, Deputy Secretary of Defense (Feb. 26, 2007). England then issued DOD Directive 7050.06, which lays out policies and responsibilities for administering the Military Whistleblower Protection Act program and which delegated the Secretary's authority to hear whistleblower appeals to the Deputy Under Secretary of Defense for Program Integration, a subordinate of the Under Secretary of Defense for Personnel and Readiness. DOD Directive 7050.06 ¶ 5.2.2.

The following year, Deputy Secretary England issued a separate directive authorizing the Under Secretary of Defense for Personnel and Readiness to exercise those same authorities and permitting the Under Secretary to "redelegate this authority to the [Deputy Under Secretary of Defense for Program Integration]." DOD Directive 5124.02, Under Secretary of Defense for

Personnel and Readiness ¶ 6.17 (Jun. 23, 2008).  It is unclear whether the 2008 delegation to the Under Secretary implicitly repealed the 2007 delegation to the Deputy Under Secretary or whether both positions held the authority simultaneously—the delegations are silent on this issue.  The following year, the acting Under Secretary further delegated the authority to his Principal Deputy.  DOD Directive 5124.08, Principal Deputy Under Secretary of Defense for Personnel and Readiness ¶ 3.a (Feb. 19, 2009).  Thus, by 2009, there were at least five officials who had the power to handle Whistleblower Act appeals:  the Secretary, the Deputy Secretary, the Under Secretary for Personnel and Readiness, his principal deputy, and the Deputy Under Secretary for Program Integration.

But Congress severely restricted the use of the "Deputy Under Secretary" title shortly thereafter, so the Department moved to eliminate most of those positions.  *See, e.g.*, National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111-84, § 906, 123 Stat. 2190, 2425 (2009) (limiting the total number of Deputy Under Secretaries to five).  In 2011, the Department disestablished the office of Deputy Under Secretary of Defense for Program Integration and transferred its functions to the Director for Enterprise Services, held by a non-Senate confirmed member of the Senior Executive Service.  *See* Action Memo, D.A. 54.  The following year, Enterprise Services was "phased out," leaving the Military Whistleblower Protection Act review duties vested in no one—at least at the lowest levels of delegation.  *Id.*

Recognizing the problem, Tamburrino wrote an "action memo" to Assistant Secretary of Defense for Reserve Affairs Jessica White, who was then "Performing the Duties of" Principal Deputy Under Secretary for Personnel and Readiness.  *Id.*  Tamburrino recommended that White formally transfer the appeal review responsibilities to Tamburrino in his capacity as Chief of Staff to ensure that *someone* would be responsible for reviewing appeals.  *Id.*  Wright initialed

the memo as "Approved" on December 14, 2012. *Id.* at D.A. 55. The memo indicated that if Wright approved the recommendation, "[t]he Office of Legal Policy [would] revise the applicable Directive and Instruction through the administrative change process." *Id.* at D.A. 54. There is no indication that the Department ever issued a formal directive delegating the authority to Tamburrino. Thus, when Tamburrino issued his decision in January 2013, he was purporting to exercise authority that Congress vested in the Secretary of Defense and which the Secretary delegated to his Deputy, then to the Under Secretary, then to the Principal Deputy Under Secretary, and then to the Under Secretary's Chief of Staff. Penrod, who succeeded Tamburrino as Chief of Staff, claimed to exercise the same authority.

Rodriguez attacks Tamburrino's and Penrod's power to hear his appeal on two fronts. First, he alleges that the authority was never properly delegated to either of them. The Action Memo vesting power in the Chief of Staff, Rodriguez argues, was not a formally issued Directive; at most, it was an internal, pre-decisional memorandum indicating an intent to delegate the power in the future. Rodriguez raised this issue with Tamburrino immediately after receiving Tamburrino's first letter denying his appeal. Pl.'s Ltr. of Feb. 27, 2013 at D.A. 36–37. Second, Rodriguez argues that because neither Tamburrino nor Penrod was appointed by the President and confirmed by the Senate, they were incapable of performing duties entrusted to the Secretary by statute. He characterizes this line of argument as alleging violations of the Appointments Clause of the Constitution, the Military Whistleblower Protection Act (which authorizes the Secretary to conduct the appeals), the Federal Vacancies Reform Act of 1998, 5 U.S.C. §§ 3345–3349d, and various Executive Orders and DOD Directives.[4] *See* Pl.'s Mot. at

---

[4] In relevant part, the Vacancies Reform Act provides that "[a]n action taken by any person who is not acting [in a temporary appointment as otherwise provided in the Act] in the performance of

16–20. In response, the Defense Department invokes various forms of regulatory deference under *Auer v. Robbins*, 519 U.S. 452 (1997).

Rodriguez may have colorable arguments. In fact, after the Parties concluded briefing on the Cross-Motions for the Summary Judgment, Rodriguez brought to the Court's attention a recent Defense Department memorandum designating a new official as "performing the duties of" the Deputy Under Secretary of Defense for Personnel and Readiness but precluding that official from carrying out any "statutory" duties under the Vacancies Reform Act, which "by law or regulation may only be performed by" Senate-confirmed officials filling that role, because the temporary official is not Senate-confirmed. *See* Dep. Sec'y of Def. Mem. of Sep. 4, 2019, ECF No. 30-1. The memo instead refers all such matters to the Secretary of Defense himself. *Id.* That line of reasoning would seem to validate Rodriguez's arguments. Moreover, any invocation of *Auer* or its progeny to an internal action memo would seem to stretch the limits of judicial deference to agencies in the interpretations of their own regulations, especially in light of the Supreme Court's recent decision in *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) ("To begin with, the regulatory interpretation must be one actually made by the agency. In other words, it must be the agency's authoritative or official position, rather than any mere ad hoc statement not reflecting the agency's views." (internal quotations omitted)).[5]

_____

any function or duty of a vacant office to which [the Act] appl[ies] shall have no force or effect." 5 U.S.C. § 3348(d)(1).

[5] The Department briefly questions whether Rodriguez waived any right to challenge Penrod's authority to hear his appeal when he agreed to remand the case from the D.C. Circuit to the Department to permit Penrod to review the case in place of Tamburrino. *See* Def.'s Mot. at 17. Rodriguez objects to that argument, pointing to the Parties' Settlement Agreement, which preserved all claims and prohibited the Parties from using the settlement as evidence against each other in future arguments. *See* Pl.'s Resp. at 6. The Court has serious doubts that Rodriguez should be permitted to challenge Penrod's authority to hear his appeal when he voluntarily agreed to submit his appeal for review by that very official. But because the Department did not develop this argument, it has waived it. *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C.

But the Court need not reach those issues because the Secretary of Defense specifically delegated to Dr. Woodson the authority to review Rodriguez's appeal. Even if the Court were to hold that Penrod had been improperly appointed under the Appointments Clause, the D.C. Circuit has "repeatedly held that a properly appointed official's ratification of an allegedly improper official's prior action, rather than mooting a claim, resolves the claim on the merits by remedying the defect (if any) from the initial appointment." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 13 (D.C. Cir. 2019) (internal quotation omitted). "[A] court's holding that there has been an Appointments Clause violation does not mean that the violation cannot be remedied by a new, proper appointment. And once there has been such an appointment, the subsequent proceeding is constitutionally suspect only if there is sufficient continuing taint arising from the first." *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 124 (D.C. Cir. 2015); *see also Wilkes-Barre Hosp. Co., LLC v. NLRB*, 857 F.3d 364, 370–72 (D.C. Cir. 2017) (holding that properly reconstituted Board properly ratified all actions of previous, improperly constituted Board); *Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 212–14 (D.C. Cir. 1998) (upholding official's ratification of prior decision made by allegedly improperly appointed predecessor), *superseded by statute on other grounds*, Federal Vacancies Reform Act of 1998, Pub. L. No. 105-277, 122 Stat. 2681 (1998), *as recognized in S.W. Gen., Inc. v. NLRB*, 796 F.3d 67, 70–71 (D.C. Cir. 2015), *aff'd* 137 S. Ct. 929 (2017); *FEC v. Legi-Tech, Inc.*, 75 F.3d 704, 707–709 (D.C. Cir. 1996) (upholding Commission's ratification of its previous decision after it excluded improperly appointed *ex officio* members); *State Nat'l Bank of Big Spring v. Lew*, 197 F. Supp. 3d 177, 182–86 (D.D.C.

---

2013). And the Court declines Rodriguez's invitation to sanction the Department for making the (undeveloped) argument. *See* Pl.'s Resp. at 6.

2016) (permitting CFPB Director to ratify his earlier decisions once properly appointed despite the fact that his original Recess Appointment was unconstitutional).

In *Intercollegiate*, the D.C. Circuit considered for the second time an administrative board's decision to impose a fee on small broadcasters. 796 F.3d at 115–16. The Court had previously vacated the board's decision because of an Appointments Clause violation. *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1342 (D.C. Cir. 2012) A newly constituted board took up the issue and reached the same conclusion. *Intercollegiate*, 796 F.3d at 115–16. The losing party argued that "[b]y merely reviewing *de novo* their predecessors' proceedings instead of conducting their own proceeding permitting firsthand credibility determinations and evidentiary rulings, the [newly appointed] Judges did nothing more than enshrine the constitutional violations that [the Court of Appeals] sought to cure." *Id.* at 117. The D.C. Circuit rejected that argument despite the fact that the new board refused to consider new evidence, refused to conduct a new hearing, and reached substantially the same result that the improperly appointed board had reached. *Id.* at 117–24. The applicable statute permitted the Board to rule on an issue without a hearing at all, and "once a new [b]oard has been properly appointed (or reconstituted), the Appointments Clause does not bar it from reaching the same conclusion as its predecessor." *Id.* at 121.

Rodriguez seeks to distinguish this case by alleging a number of procedural flaws and suggesting that Woodson's decision was not an independent, de novo review but remained "constitutionally suspect" because of "sufficient continuing taint arising from" Penrod's alleged violation. Pl.'s Resp. at 12 (citing *Intercollegiate*, 796 F.3d at 124). First, he points out that he did not request another round of review by a Defense official—the Secretary made the appointment unilaterally (and while the case was pending on appeal) in an apparent attempt to

salvage its case from what may have been a meritorious challenge.[6]  *See* Pl.'s Resp. at 12.  But

that would seem to be an allegation that the Defense Department improperly attempted to moot

the issue by voluntary cessation, a legal theory the D.C. Circuit expressly rejected in the context

of ratification in *Guedes*.  *See* 920 F.3d at 15–16 ("Here, ratification materially changed the

circumstances of litigation only because it was undertaken by a validly appointed [official]

whose authority to act [Plaintiff] does not challenge.")

    Second, as if anticipating that holding in *Guedes*, Rodriguez challenges Woodson's

authority to act by alleging that Secretary Carter never actually appointed him.  Rodriguez

alleges that the designation letter was signed by an auto-pen rather than by Carter himself and

that neither Carter nor Woodson ever informed the Defense Department Inspector General of the

appointment or subsequent decision (as required by DOD Directive 7050.06 ¶ 5.2.5).  *See* Pl.'s

Reply at 5–6.  Moreover, he takes issue with Carter's supposed selection of Woodson, "a

medical doctor without relevant experience relating to the [Military Whistleblower Protection

Act], personnel matters, . . . the correction of military records," or a host of other issues unique to

the case.  *Id.* at 6.  Yet even if all of those allegations were true, none would invalidate the

appointment.  It is not the role of the Judiciary to police the inner workings of a cabinet

secretary's office, "probe the mental processes of an agency decisionmaker," *Hercules v. EPA*,

598 F.2d 91, 123 (D.C. Cir. 1978) (internal quotation omitted), or "examine the internal

deliberations of the [agency], at least absent a contention that [Woodson was] actually biased,"

*Legi-Tech*, 75 F.3d at 709.  There is no evidence that someone forged Secretary Carter's

signature without his permission or that an alleged failure to follow internal reporting procedures

---

[6] Rodriguez does not argue that the Department lacked power to conduct a subsequent review
while the appeal was pending in the Court of Appeals.

after the fact somehow affected the outcome of Woodson's review. And if the Secretary of Defense chose to delegate his authority to an otherwise minimally qualified official under the Appointments Clause and relevant statutes, then the Court will not question his decision as a matter of policy purely within his discretion.[7]

Third, Rodriguez points to the amount of time Secretary Carter afforded Woodson to conduct his review and alleges that it would have been impossible for Woodson to "carefully consider" an administrative record of more than 2,000 pages of documents in the span of a few days. Pl.'s Reply at 6. Moreover, Woodson left his position less than two months after conducting the review, so Rodriguez argues that Woodson would have been busy wrapping up his affairs at the Department and cannot have had sufficient time and attention to devote to reviewing Rodriguez's case. *See id.*

For ratification to be effective, the new official must "conduct an independent evaluation of the merits," *Intercollegiate*, 796 F.3d at 117, and reach "a detached and considered judgment," *Doolin*, 139 F.3d at 213. On its face, Woodson's decision indicates that he "carefully considered the[] documents" and reviewed the appeal de novo, as expressly required by Secretary Carter's delegation. Woodson's Decision. While Woodson was required to reach his own conclusions, the Court does not accept Rodriguez's contention that Woodson was required to read each of the thousands of pages in the administrative record and spend weeks or months poring over the law in doing so. Imagine if a panel of the Court of Appeals were to read the briefs in an appeal,

---

[7] The Court takes notice of the fact that in addition to his civilian career as a surgeon and professor of medicine, Dr. Woodson is also a general officer in the Army Reserve. It is unlikely that he does not understand "personnel matters or the correction of military records" as Plaintiff suggests. *See* Pl.'s Reply at 6; *see also Maj. Gen. Jonathan Woodson*, U.S. Army Reserve, https://www.usar.army.mil/Leadership/Article-View/Article/1801158/maj-gen-jonathan-woodson (last visited Feb. 5, 2020).

study the district court's opinion, hear oral argument, and issue an opinion. If, after the fact, the panel discovered that two of its members should have recused themselves from the case (and failed to do so inadvertently), the court could vacate the opinion and assign the case to a new panel. The new judges would not need to start from scratch—it would be more than reasonable to read the briefs previously submitted, listen to the recording of the oral argument, review existing bench memos and recommendations from court staff, refer to the record as needed to evaluate the parties' arguments, and summarily adopt the reasoning contained in the original panel's opinion if the new panel believed it to be correct. *See, e.g.*, *Muckle v. Wells Fargo Bank*, No. 15-1195 (1st Cir. Aug. 20, 2018) (per curiam) (unpublished) (summarily affirming district court's judgment after first panel vacated earlier order due to late recusal), *cert. denied* 139 S. Ct. 1173 (2019). Depending on the complexity and urgency of the case, that process could very well take no more than a day or two to accomplish.

Here, even before receiving the full administrative record, Woodson would have had access to the 2010 Board decision (37 pages), the 2012 Board decision (seven pages), Rodriguez's appeal and accompanying memorandum of law (36 pages), Rodriguez's read-ahead memorandum for Penrod (five pages), and Penrod's decision (five pages). All together, these documents amount to ninety pages, so it is entirely reasonable to think that a senior Defense Department official, with the assistance of staff counsel, could review the information over the course of a few days, refer to the administrative record as needed to check the Parties' arguments once it arrived, and render a decision endorsing Penrod's rationale and result. *See Fortuna Enters., LP v. NLRB*, 789 F.3d 154, 158 n.2 (D.C. Cir. 2015) (upholding NLRB decision that reinstated and incorporated by reference two earlier NLRB decisions that had been vacated because of an Appointments Clause violation). The amount of material to review and procedural

posture in this case distinguish it from *Chevron Corp. v. Donziger*, 833 F.3d 74, 104–106, 135 (2d Cir. 2016) (upholding district court's factual finding that Ecuadorian trial judge did not personally review 200,000-page record and write a 188-page, single-spaced memorandum opinion in four months but was instead bribed to allow litigant to write the judgment in its own case).  Absent an allegation that Woodson was himself biased or otherwise legally unable to conduct a de novo review—neither of which is present here—the Court accepts Woodson's "ratification of [the] prior decision[] at face value and treat[s] it as an adequate remedy for [any possible] constitutional violation."  *Legi-Tech*, 75 F.3d at 709.  "Identifying an Appointments Clause infirmity in a decision does not guarantee that a party will get the merits decision it wants."  *Intercollegiate*, 796 F.3d at 121.

### B.    Rodriguez's Due Process Claims Do Not Justify the Requested Relief

Rodriguez's second argument is that Penrod's decision (as adopted by Woodson) failed adequately to explain the rationale for denying relief despite Rodriguez's "non-frivolous due process claims," which he asserted both before the Board and in his appeal.  *See* Pl.'s Mot. at 20–26.  Those claims included allegations that (1) someone forged General Keane's signature on the 1999 Inspector General Report (and the Army then prevented Rodriguez from obtaining a readable copy of the report for over a decade), but that the Board failed to award any relief despite finding that Rodriguez did, in fact, experience reprisal for his whistleblowing (in the form of a letter of reprimand), *id.*; (2) the Board failed to observe several DOD procedural requirements—such as forwarding its decision to the Secretary of the Army for final decision, adving Rodriguez of his right to appeal to the Secretary, or mailing him a copy of the decision— and that both Tamburrino and Penrod failed to return a decision within the required timeline, *id.* at 24–26, 31–32; and (3) Penrod either failed to give adequate consideration to the analogous case of an Air Force lieutenant colonel in similar circumstances who received a retroactive

promotion or impermissibly failed to apply the case's precedential effect to Rodriguez's situation, *id.* at 25–26, 32–34. To remedy these alleged due process violations, Rodriguez now asks the Court to "direct the Secretary of Defense . . . to provide the 'whole loaf' of relief to Petitioner that is warranted by the administrative record . . . , including retroactive promotion." *Id.* at 26.

In support of his arguments, Rodriguez largely relies on, among other cases, *Frizelle*, 111 F.3d at 172, which also involved the correction of military records. There, the D.C. Circuit laid out the standard for reviewing an administrative agency's alleged failures to address a petitioner's arguments: "While the Board could have explained its reasons for rejecting Frizelle's arguments in more detail, an agency's decision need not be a model of analytic precision to survive a challenge. A reviewing court will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 176 (internal quotations omitted). "All that is required is that the [agency's] decision 'minimally contain a rational connection between the facts and the choice made.'" *Id.* (quoting *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995) (quoting *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43)). The court rejected most of Frizelle's arguments, but it reversed the agency's decision and remanded to the agency "because the Board's decision did not respond to two of Frizelle's arguments, which [did] not appear frivolous on their face and could affect the Board's ultimate disposition." *Id.* at 177.

Rodriguez's reliance on *Frizelle* thus assumes that his due process claims were not only non-frivolous but that they were material to the outcome of his case, whether before the Board or on appeal. Rodriguez's briefing is sorely lacking in this respect: it makes almost no effort to explain why any of the alleged due process violations justifies substantive relief of the type he

requested—retroactive promotion, credit for time not served and training not completed, and reinstatement to active duty.

### 1.     The Board and Penrod Accounted for the Forged Inspector General Report

Plaintiff is apparently correct that General Keane's signature was forged on the 1999 Inspector General Report.  But Penrod considered this fact, as did the Board, which agreed to rehear the case in 2012 on the basis of this new evidence, and which considered in detail the effect of that evidence on its earlier decision.  *See* Penrod's Decision at 2, D.A. 2; Second Board Decision at 5–6, D.A. 117–18.  After conceding the forgery and agreeing to exclude the 1999 Inspector General Report from consideration, the Board then stepped through each of Rodriguez's requests for relief and explained why, even assuming that the 1996 letter of reprimand constituted illegal reprisal, Rodriguez was not eligible for the relief he sought beyond removal of the letter from his record, which the Board had already accorded him.  *Id*.  And as discussed below, even assuming that Rodriguez is correct and that he was the victim of reprisal, the Board reasonably concluded retroactive promotion was not warranted.  *See infra* Section IV.D.1.

### 2.     Rodriguez's Due-Process Allegations, If True, Were Harmless Error

The procedural violations Rodriguez alleges the Board and the Department committed during the Military Whistleblower Protection Act process do not seem to have prejudiced Rodriguez in the end.  He is correct that the Secretary of the Army failed to "issue a final decision with respect to [the] application [for records correction] within 180 days after the application [was] filed."  10 U.S.C. § 1034(g)(4).  But the very next sentence of that subsection identifies the remedy for such a failure:  "If the Secretary [of the Army] fails to issue such a final decision within that time, the . . . former member shall be deemed to have exhausted [his] administrative remedies," such that he becomes eligible to appeal to the Secretary of Defense.

*Id.* Subsection 1034(g)(4) thus appears to be designed to give the Secretary of the Army adequate time to resolve a servicemember's complaints before the case is elevated to the Secretary of Defense; it does not invest the servicemember with substantive rights or merit automatic relief in case the service secretary declines to get involved. That's what happened in Rodriguez's case—once the Secretary of the Army's deadline passed, Rodriguez took his case to the Secretary of Defense.

Likewise, even if the Board failed to advise Rodriguez of his right to appeal to the Secretary of Defense under § 1034(h), Rodriguez did, in fact, file such an appeal, so he was not prejudiced by the lack of notice. *See Peguero v. United States*, 526 U.S. 23, 28 (1999) (holding that, even in the criminal context, a court's failure to inform defendant of his right to appeal is harmless error if defendant had actual knowledge of the right).

Finally, even assuming that the Board failed to mail a copy of its decision to Rodriguez and that Penrod took too long to render a decision under DOD Directive 7050.06 ¶ 5.2.2 or § 1034(h), Rodriguez has failed to establish any resulting prejudice against his case, and none of those violations would entitle Rodriguez to automatic, retroactive promotion or the financial windfall that would accompany it. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659–60 (2007) (applying harmless error standard under 5 U.S.C. § 706); *see also PDK Labs, Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("In administrative law, as in federal civil and criminal litigation, there is a harmless error rule.").

### 3. Penrod's Consideration of the Air Force Case was Adequate.

Rodriguez also asserts that Penrod did not adequately distinguish the case of the Air Force officer who obtained a retroactive promotion to colonel in 2004. Like Rodriguez, that officer was relieved from squadron command, given a negative performance evaluation, and denied the standard end-of-tour award. *See generally* Air Force Board Decision, D.A. 59–68.

There, neither the Air Force Inspector General nor the Defense Department Inspector General adequately investigated the alleged reprisal, so the officer filed a Military Whistleblower Protection Act petition with the Air Force Board for Correction of Military Records. *Id.* at 5–6, D.A. 63–64. The Board declined to find that the original relief from command was an abuse of the superior commander's discretion, but it substantiated the officer's allegations of illegal whistleblower reprisal and recommended to the Secretary of the Air Force that the officer be retroactively selected for promotion to colonel, nominated by the President for appointment, and confirmed by the Senate. *Id.* at 9, D.A. 67.

Rodriguez submitted the case files from that Air Force matter to Tamburrino on October 22, 2012, along with a list of other cases over the past several decades in which a military board had recommended retroactive promotion. *See* Pl.'s Ltr. of Oct. 22, 2012, D.A. 56–58. In her later review Penrod indicated that she "considered the Air Force [Board] case [Rodriguez] submitted in rebuttal, along with a list of 28 other instances where a Secretarially-directed recommendation for promotion was granted." Penrod Decision at 3, D.A. 3. But she found "that the [Army Board] articulated legitimate reasons for its decision, based on the specific facts and circumstances of [Rodriguez's] case," namely that he was "not eligible for, considered, or selected for Colonel by a Reserve Component Selection Board[] prior to [his] retirement." *Id.* She went on to summarize the Board's reasons for denying retroactive promotion. *Id.*

That explanation is more than enough to constitute "a satisfactory explanation for [Penrod's] action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). It also adequately explained why Penrod declined to apply the Air Force precedent to Rodriguez. *See Kreis II*, 406 F.3d at 687 (criticizing Air Force Board

for ignoring its own precedent).   Unlike the Air Force officer, who remained on active duty and

had already been passed over by a selection board for promotion to colonel, Rodriguez retired

before he was eligible for promotion, so no selection board ever evaluated his candidacy.

Penrod's Decision, D.A. 3; *compare* Air Force Board Decision at 3, D.A. 61 ("Applicant was

considered and not selected for promotion to the grade of colonel . . . by the [2003] Colonel

Central Selection Board"), *with* Second Board Decision at 2, D.A. 114 ("[T]here was no

evidence indicating the applicant was eligible for, considered, or selected for promotion to

colonel by a Reserve Component Selection Board . . . prior to his transfer to the Retired

Reserve."); *see also infra* Section IV.D.1.  That distinguishing factor was both reasonable and

material to the outcome of Rodriguez's case.

### C.        The Defense Department's Appeal Process Was Adequate

Next, Rodriguez raises two specific concerns with the Defense Department's handling of

his case and its administration of Military Whistleblower Protection Act appeals more broadly.

He argues that (1) the applicable regulations fail to establish a standard of review by which DOD

officials should evaluate the decisions of service secretaries, Pl.'s Mot. at 27–29, and (2) that the

Department improperly supplemented the administrative record before the Court of Appeals

(which was later transferred to this Court), *id.* at 29–31.

### 1.        Rodriguez Was Not Prejudiced by the Standard of Review

The Act permits servicemembers who have exhausted their administrative remedies

before the Board and their service secretary to appeal to the Secretary of Defense.  10 U.S.C.

§ 1034(h).  The statute directs the Secretary to "make a decision to reverse or uphold the decision

of the [service secretary] within 90 days."  *Id.*  The Department's implementing regulation (as it

existed when Rodriguez filed his appeal) delegated the Secretary's authority and directed the

relevant official to "review the final decision [of the service secretary] and decide whether to

uphold or reverse the decision."  DOD Directive 7050.06 ¶ 5.2.2.  It also granted the reviewing

official "access to all research, reports, investigations, audits, reviews, documents, papers, or any

other material necessary to carry out [her] responsibilities" and "obtain for review and request

the [service secretary] to comment on evidence considered by a [Board for Correction of Military

Records]."  *Id.* ¶¶ 5.2.3–5.2.4.

Rodriguez contends that neither the statute nor the regulation specified the standard of

review by which Tamburrino, Penrod, or Woodson were to evaluate the Board's decisions.  Pl.'s

Mot. at 27.  Many agencies that regularly conduct administrative adjudications and appeals have

regulations proscribing the standards reviewing bodies must use.  For example, when the Social

Security Administration's Appeals Council handles appeals from denials of benefits by

administrative law judges, it reviews legal questions de novo, findings of fact under the

substantial evidence standard, and discretionary matters for abuse of that discretion.  *See* 20

C.F.R. § 404.970(a).  Likewise, the Board of Immigration Appeals reviews immigration judges'

factual findings for clear error, but the "Board may review questions of law, discretion, and

judgment . . . *de novo*."  8 C.F.R. § 1003.1(d)(3).  The Defense Department does not seem to

have articulated the standard by which its officials are to review appeals from records corrections

boards under the Military Whistleblower Protection Act.  Rodriguez raised that issue from the

outset of his appeal.  *See* Pl.'s Mem. of Law in Supp. of Appeal to Sec'y of Def. Pursuant to the

Military Whistleblower Protection Act ("Pl.'s Admin. Appeal") at 4–5, D.A. 81–82.

From the text of her decision, it appears that Penrod employed the same "arbitrary-and-

capricious" standard of review that courts use when reviewing agency action under the APA.

Penrod began her decision by stating:

> I have reviewed all of the materials you submitted to this office to
> date, including the evidence the [Board] and the previous reviewing

authority examined in reaching a decision in your case. After careful consideration, I find that the [Board]'s findings and conclusions are clearly supported by the evidence, and the Army's decision should be upheld.

Penrod's Decision at 2, D.A. 2. She went on to find that "the Board provided a fair, clear, and rational explanation of its findings based on the evidence presented," that the Board's "denial of [Rodriguez's] claim of constructive discharge was not arbitrary, capricious, or contrary to law," that the "Board's rationale [was] supported by substantial evidence," and that the Board "did not abuse its substantial discretion in denying the specific relief requested." *Id.* Similar language appears throughout the document alongside reasoned explanations supporting Penrod's conclusions. *See generally id.* In conclusion, Penrod stated that she could not "reverse the Army's final decision, because [she found] that it show[ed] a rational connection between the 'facts found and the choice made.'" *Id.* at 5, D.A. 5. Penrod thus reviewed the Board's decision under the same (or at least a very similar) standard of review that courts use to review agency action under the APA. *See supra* Section III.

Woodson, for his part, expressly stated that he had conducted a de novo review of Rodriguez's appeal, and then went on to adopt Penrod's reasoning and conclusions:

> [T]he Secretary of Defense delegated authority to me to review *de novo* your appeal . . . . I was provided with the entire record provided to Ms. Virginia Penrod . . . [and] I have carefully considered these documents . . . . Even considering the additional information you raise that was not presented to the [Board], I find that the evidence you presented is insufficient to satisfy your burden of proof, and the relief you requested is not justified. I agree with the rationale provided by the [Board] and Ms. Penrod, and I adopt their reasoning as my own.

Woodson's Decision. This language is ambiguous; it's unclear whether Woodson conducted a de novo review of just Penrod's decision or also of the Board's. His use of APA-sounding

34

language suggests that he gave no deference to Penrod's decision but employed the same deferential "arbitrary-and-capricious" standard to the Board's decision that she did.

Before this Court, Rodriguez once again points out that no Defense Department regulation establishes the appropriate standard of review for Penrod to have used. Pl.'s Mot. at 27. The government did not even try to argue that point.[8] But having established that fact, Rodriguez's conclusion is a non sequitur: "This admitted lack of a prescribed 'standard of review' for an administrative appeal process required by statute . . . is contrary to the most basic precepts of Anglo-American jurisprudence [and] . . . [a] *fortiori* . . . is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* at 28 (quoting 5 U.S.C. § 706(2)) (citing 1 William Blackstone, Commentaries *45) (other internal citations omitted).

Rodriguez's argument fails for three reasons. First, while it is common for administrative agencies to establish review standards by regulation, he offers no modern support for his contention that the Defense Department was *legally required* to do so. Second, Rodriguez makes no effort to demonstrate that he was somehow prejudiced by the lack of an established standard

---

[8] Rodriguez argues that the Department inadequately responded to this argument and therefore conceded the issue. *See* Pl.'s Reply at 14–15, ECF No. 20; *see also id.* at 10 (citing *Elec. Privacy Info. Ctr. v. TSA*, No. 1:11-cv-00290, slip op. at 2 (D.D.C. Nov. 1, 2011) (treating as conceded any unopposed arguments on summary judgment)). Because the Court assumes Rodriguez's contention for the sake of argument, any waiver on the Department's part is irrelevant. Rodriguez similarly claims that the Department failed to respond to a host of the arguments contained in his Motion and therefore waived them all. *See id.* at 10–23. But Rodriguez's argument does not apprehend the standard for waiver; he equates an argument's length with its sufficiency. For example, Rodriguez argues that Penrod "failed to address and thereby concedes that 'her final decision includes an explained departure from precedent, and is therefore arbitrary and capricious'" because she did not adequately explain her reasons for distinguishing the Air Force Board case Rodriguez argued was on point in his own case. *Id.* at 17–18 (quoting Pl.'s Mot. at 32). But the Department's Motion addressed this very issue. *See* Def.'s Mot. at 23–24; *see also supra* Section III.B.3. Perhaps Rodriguez believes that the two paragraphs the Department devotes to the question are insufficient or unpersuasive, but that's a far cry from waiver.

of review.  Rodriguez's briefing contends that "[t]he lack of . . . a prescribed standard . . . is reflected in what can only be described as a chaotic 'Administrative Record' certified by Respondent to this court," Pl.'s Mot. at 29, but the Court does not understand how that generalized argument demonstrates any concrete prejudice that vacatur and remand might remedy.

Finally, and perhaps most importantly, Rodriguez himself argued in his original appeal that the appropriate standard for the Secretary of Defense (or his delegate) to use was the deferential APA standard that Penrod and Woodson actually employed.  As Rodriguez put it:

> The general standard of review prescribed in the [APA] is that agency action should be reversed if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 70[6](2)(A). . . . [T]he Secretary of Defense should reverse the [Army Board] under 10 U.S.C. § 1034(g) and the APA standard if the [Board] has failed to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."

Pl.'s Admin. Appeal at 5, D.A. 82 (quoting *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43).[9]

Because Penrod and Woodson used the very standard of review Rodriguez asked them to use, he cannot demonstrate any harm that would warrant vacatur of the Department's actions simply because that standard was not mandated by some pre-existing regulation.  *See PDK Labs.*, 362

---

[9] Rodriguez separately mentioned *Kreis II's* discussion of the appropriate level of deference by civilian courts to military administrators with specific expertise in military affairs.  *See* Pl.'s Admin. Appeal at 5, D.A., 82 (citing *Kreis II*, 406 F.3d at 686 ).  He noted that "the Secretary of Defense, whom himself as 'military expertise' superior by law to any expertise of a subordinary 'Secretary of the military department,' need not apply any special deferential standard in his review of . . . the . . . [Board's] decision." *Id.*  Rodriguez seems to have been asserting that the Secretary of Defense need not use the "unusually deferential" standard courts sometimes use in military records cases, but he does not seem to have contradicted his argument that the APA's "arbitrary-and-capricious" standard was the correct standard of review for the Secretary to use.  Rodriguez has never argued, whether in administrative proceedings or on judicial review, that Penrod or Woodson were required to review the Board's decisions de novo.

F.3d at 799 ("If the agency's [alleged] mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.").

### 2.    Augmentation of the Administrative Record was Harmless Error

The same goes for Rodriguez's second contention.  After Rodriguez renewed his petition for judicial review in the Court of Appeals, the Department filed a certified index to the administrative record.  *See* Certified Index to Record, *Rodriguez v. Penrod*, No. 15-1096 (D.C. Cir. Oct. 13, 2015), ECF No. 1577938.  Over a month later, the Department then amended that index to add one extra document:  a decisional memo prepared by Major Ryan Oakley, who was staff counsel to Tamburrino.  *See* Amended Certified Index to Record, *Rodriguez v. Penrod*, No. 15-1096 (D.C. Cir. Nov. 19, 2015), ECF No. 1584516.  Rodriguez timely objected to the change, arguing that the addition violated both the statute governing the contents of the record on appeal and the associated Federal Rule of Appellate Procedure.  *See* Pl.'s Ltr. of Nov. 20, 2015, *Rodriguez v. Penrod*, No. 15-1096 (D.C. Cir. Nov. 20, 2015), ECF No. 1584665.[10]  The Department filed what appears to be the same amended index after the case was transferred to this Court, ECF No. 9, and Rodriguez renewed his objection, Pl.'s Mot. at 29–31.

To the extent that Rodriguez argues that the memorandum is improperly before this Court, the Court agrees to exclude the memorandum from consideration in reaching its decision, and therefore any error in the record is harmless.  *See PDK Labs.*, 362 F.3d at 799.  But Rodriguez simultaneously argues that the Court *should* take the document into consideration, because he argues that Major Oakley impermissibly collaborated with legal counsel for the Board in preparing his recommendation to Tamburrino, effectively short-circuiting any

---

[10] The D.C. Circuit does not seem to have ruled on the objection, likely because it held that it lacked jurisdiction over the controversy.

independent review and transforming the appeal into a "non-transparent adversarial process plagued by conflicts of interest." Pl.'s Mot. at 29. He likens the matter to a situation in which a judicial law clerk serving on the court of appeals coordinates in secret with a clerk from the district court in a case on which the district court clerk originally worked. *Id.* at 31.

This line of argument is confusing for two reasons. First, Rodriguez argues (and the Court agrees) that the document should not be before the Court in the first place, so the Court cannot therefore rely on it as evidence of a procedural violation under the APA. But second, even if the Court were to consider the document, there is no indication that either Penrod or Woodson relied on Major Oakley's memorandum in reaching their own conclusions. Oakley prepared the memorandum in 2012, and Tamburrino allegedly relied on it in reaching *his* decision. *See generally* Maj. Ryan Oakley's Mem., D.A. 42–53. But the record is devoid of indications that either Penrod or Woodson saw the memorandum or relied on it in *their* reviews of the case, so Rodriguez cannot show that its very existence prejudiced him.

Finally, although Rodriguez claims Oakley's participation transformed the review from a one-sided petition for review into adversarial litigation, *see* Pl.'s Mot. at 29, he cites no cases for the proposition that senior Executive Branch officials (like judges) cannot rely on staff counsel to assist them in handling legal appeals. The fact that counsel's recommendations differed from Rodriguez's is both unsurprising and fully consistent with due process. Moreover, if the Court were to consider the document, it might serve as evidence that Tamburrino *did* conduct a de novo review, despite the lack of explicit rationale in his letters to Rodriguez, and would therefore work against Rodriguez's contention that Tamburrino failed to consider his appeal adequately.

### D.     Penrod and the Board Explained Their Reasons for Denying Relief

Rodriguez's final argument is that the Board's decision to grant partial relief was inconsistent with the Military Whistleblower Protection Act and the APA. He relies primarily on a 1979 case from the Court of Claims (now the Federal Circuit) sitting en banc, which stated that

> [W]here an applicant has convinced a correction board to correct his record it must not grant him "half-a-loaf" of relief. He must be made "whole." In general, military correction boards have an abiding moral sanction to determine, insofar as possible, the true nature of an alleged injustice and to take steps to grant thorough and fitting relief.

*Sanders v. United States*, 594 F.2d 804, 813 (Ct. Cl. 1979) (en banc) (internal quotations omitted). He also points to appellate decisions that have cited *Sanders* approvingly. *See, e.g.*, *Frizelle*, 111 F.3d at 177; *Van Drasek v. Lehman*, 762 F.2d 1065, 1071 (D.C. Cir. 1985); *Chappell v. Wallace*, 462 U.S. 296, 303 (1983). It is important to note that both *Chappell* and *Frizelle* cite to different portions of the *Sanders* opinion and involve the standard of review courts must observe in appeals directly from a records correction board, not the types of relief to which a servicemember may be entitled. *See, e.g.*, *Frizelle*, 111 F.3d at 177 ("Here, the Board's decision can reasonably be interpreted as a statement that Frizelle had not shown sufficient evidence of bias on the part of the officers who prepared the [Officer Evaluation Report] to 'overcome the "strong but rebuttable presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith."'" (quoting *Collins v. United States,* 24 Cl. Ct. 32, 38 (1991) (quoting *Sanders v. United States,* 594 F.2d at 813))).

In any event, subsequent case law has recognized that the assumptions at issue in *Sanders* (however valid they may have been at the time) no longer apply because Congress changed the relevant statute. The primary holding in *Sanders* was that "where an officer demonstrates that his military record contains defective [performance reviews], the ultimate burden is on the

government to show that the officer would not have been promoted had his record contained no error." *Richey v. United States*, 322 F.3d 1317, 1323 (Fed. Cir. 2003) (citing *Sanders*, 594 F.2d at 818). But Congress amended the statute in 1980 by adding 10 U.S.C. § 628, thereby overruling *Sanders*' holding regarding the appropriate relief once a Board has discovered injustices. 322 F.3d at 1323–24. As it stands today (and applies in this case) the statute provides that when the Secretary of the Army (acting through the Board)

> determines, in the case of a person *who was considered for selection for promotion by a promotion board but was not selected*, that there was material unfairness with respect to that person, the Secretary may convene a special selection board under this subsection to determine whether that person (whether or not then on active duty) should be recommended for promotion.

10 U.S.C. § 628(b)(1) (emphasis added). That language makes clear why the Board (and Penrod) declined to refer Rodriguez's case to a special selection board: Rodriguez was never "considered . . . by a promotion board but . . . not selected." *Id.*

### 1. The Board and Penrod Reasonably Concluded that Rodriguez is Ineligible for Retroactive Promotion

Rodriguez insists that "[t]he Board is empowered to order retroactive . . . promotion." Pl.'s Mot. at 14 (quoting *Chappell*, 462 U.S. at 303). *Chappell* did cite 10 U.S.C. § 1552(c) for that proposition, *see* 462 U.S. at 303, although subsection (c) has more to do with the mechanics of paying out claims for retroactive pay and does not expressly authorize the Board to order retroactive promotions. *See* 10 U.S.C. § 1552(c)(1) ("The Secretary concerned may pay, from applicable current appropriations, a claim for the loss of pay, allowances, compensation, emoluments, or other pecuniary benefits, if, as a result of correcting a record under this section,

the amount is found to be due the claimant on account of his . . .service in the Army . . . .").[11] Subsection *1552(a)(1)* does permit the Secretary of the Army to "correct any military record . . . when the Secretary considers it necessary to correct an error or remove an injustice" and provides that the Board is the vehicle through which the Secretary takes such actions.

The broad statement in *Chappell* on which Rodriguez relies is thus technically correct. But Rodriguez's argument that the Board's decision *not* to order *his* retroactive promotion was therefore contrary to law (that is, that the Board was *required* to order such a promotion) relies on a reading of the Board's powers completely divorced from the statutory and regulatory context. The Defense Officer Personnel Management Act of 1980 ("DOPMA"), Pub. L. No. 96-513, 94 Stat. 2835, and the Reserve Officer Personnel Management Act of 1994 ("ROPMA"), Pub. L. No. 103-337, §§ 1601–93, 108 Stat. 2663, 2921–3027 (1994), govern the process of selecting military reserve officers for promotion. The typical process involves an annually established selection board, which reviews the reserve officers then eligible for promotion and selects some number of them for advancement. *See, e.g.*, 10 U.S.C. § 14101(a)(1) ("Whenever the needs of the Army . . . require, the Secretary [of the Army] shall convene a selection board to recommend for promotion to the next higher grade . . . officers on the reserve active-status list of [the Army] in a permanent grade from first lieutenant through brigadier general.").

But the Acts also allow for the establishment of Special Selection Boards to review the candidacy of officers who were either (a) "not considered by promotion boards due to administrative error" or (b) "considered by promotion boards in unfair manner." 10 U.S.C. § 628(a), (b). The corresponding Army Regulations follow those guidelines. *See* Army Reg.

---

[11] As it existed at the time of *Chappell*, the statute did not meaningfully differ from the current version. *See* 10 U.S.C. § 1552(c) (1982).

("AR") 135-155 ¶ 3-19(a) (Jul. 13, 2014) ("Officers . . . who have either failed of selection for promotion, or who were erroneously not considered for promotion through administrative error may be reconsidered for promotion by . . . a special selection board.").  The Regulations explicitly state that "[t]hese boards are convened to correct/prevent an injustice to an officer or former officer *who was eligible for promotion* but whose records (1) [t]hrough error, were not submitted to a mandatory promotion board for consideration [or] (2) [c]ontained a material error when reviewed by the mandatory selection board."  *Id.* ¶ 3-19(c) (emphasis added).  The regulation authorizes the Board to refer cases meeting these criteria for consideration by a Special Selection Board.  *Id.* ¶ 3-19(d)(3).

In its first decision here, the Board explained that Rodriguez was not eligible for such a referral because there was "no evidence that [Rodriguez] was eligible for, considered, or selected for promotion to [colonel] by a[ Reserve Component Selection Board] prior to his transfer to the Retired Reserve."  First Board Decision at 31, D.A. 549.  It further explained that because Rodriguez became a lieutenant colonel on December 19, 1994, "the earliest date he would been eligible for consideration for promotion to [colonel] would have been by the 1998 [selection board] that convened on 14 July 1998 and adjourned on 14 August 1998."  *Id.*  But Rodriguez retired on December 1, 1997—more than seven months before that next selection board convened.  *Id.* at 12, D.A. 530.  The 1998 selection board therefore never considered Rodriguez for promotion, making him ineligible for retroactive consideration by a Special Selection Board under AR 135-155.  *Id.* at 31, D.A. 549.  In sum, Rodriguez does not fall within the group of officers eligible for retroactive promotion under 10 U.S.C. § 628, and thus the Board was not required to order the "whole loaf" of relief envisioned in *Sanders* or subsequent Federal Circuit or D.C. Circuit cases elaborating on that concept.  *Richey*, 322 F.3d at 1323–24

Penrod's decision, when read in the context of what the Board had already explained, reasonably concluded that the Board correctly declined to "order" Rodriguez's retroactive promotion or refer him to a special selection board for new consideration. Penrod's Decision at 2–3, D.A. 2–3. That regulatory context also explains why Penrod distinguished the Air Force precedent Rodriguez submitted for her consideration: the officer in that case had already been considered and rejected by two promotion selection boards, so he fell within the criteria for retroactive promotion. *Id.* at 3; *see also* Air Force Board Decision at 8, D.A. 66 ("[W]e note that an officer's best chance at selection for promotion is when he or she is considered In the Primary Zone (IPZ). However, when the applicant competed IPZ before the [2003 selection board], instead of a sterling [performance evaluation] rendered on him while serving as a commander in combat and a [Meritorious Service Medal], he had [a] contested [evaluation] that we have found to be in error and/or unjust."). Those circumstances adequately distinguish that case from this one.

### 2.      The Board and Penrod Reasonably Concluded that Rodriguez Was Not Constructively Discharged

Rodriguez attempts to overcome this impediment to consideration for promotion by advancing a theory of constructive discharge. He argues that his superior officers "downgrad[ed] his position and block[ed] his transfer to other positions" after his relief from battalion command, effectively "assur[ing] that he would not be promoted" by the 1998 selection board. Pl.'s Resp. at 24. To support that contention, Rodriguez points to a host of letters authored by various senior officials in the New York Guard with firsthand knowledge of his performance and the circumstances leading to his retirement. *Id.* at 24–25. He submitted those letters to the Board (both on the initial review and on reconsideration), and he raised them before Penrod to argue that the Board's conclusions were not supported by substantial evidence in the record. *Id.*;

*see also* Pl.'s Req. for Army Board for Correction of Military Rs. Recons. of Jan. 3, 2012, D.A. 119.

The Board considered Rodriguez's argument and rejected it twice. It concluded that Rodriguez

> retained the option to remain in the [Army Reserve] in an active status by either transferring to the [Individual Ready Reserve] or to a Troop Program Unit . . . [a temporary holding unit] at the time he left the [New York Guard]. As a result, given he had options to stay on the [Reserve Active Status List] in order to compete for promotion without remaining in the [New York Guard] and subjecting himself to this adverse command climate, his transfer to the Retired Reserve was in fact a voluntary action.

Second Board Decision at 6, D.A. 118. Rodriguez vehemently denies the accuracy of that finding. *See* Pl.'s Resp. at 15–16. The officers who wrote letters to the Board on Rodriguez's behalf uniformly agreed that the circumstances of Rodriguez's retirement were abnormal. For example, retired Colonel James Sordi asserted that Rodriguez's position was downgraded to a lower paygrade even though some of Rodriguez's peers had indicated their intent to retire rather than compete for promotion to colonel and had volunteered to fill the downgraded positions. *See* Col. (ret.) James Sordi's Ltr. of Oct. 31, 2011, D.A. 562–63. Sordi also stated that Rodriguez was prevented from transferring to other positions and these impediments defeated any realistic chance he had to compete for promotion, so he was forced to retire. *Id.* Further, Sordi stated that the fact that Rodriguez's retirement paperwork was processed and finalized in the span of a few weeks (rather than the many months a typical case would take) was evidence that "[s]omeone . . . wanted LTC Rodriguez out as quickly as possible." *Id.* at D.A. 562–63. Rodriguez relies on this evidence to argue that he was constructively discharged from the Army and was wrongfully prevented from having his record considered by a selection board. He

further contends that both the Board and Penrod failed to take this "uncontested evidence" into account and instead gave a pretextual reason for denying relief. *See, e.g.*, Pl.'s Resp. at 15.

Rodriguez does not cite to any cases recognizing the possibility of constructive discharge relating to military officers, so the Court is unsure of whether such a theory is cognizable under the statutes authorizing the Board to correct a servicemember's record. *See* Pl.'s Mot. at 14 (citing *Shoaf v. Dep't of Agric.*, 260 F.3d 1336, 1340 (Fed. Cir. 2001) (evaluating a civil service employee's allegation of constructive discharge from federal employment)). But even assuming that such a theory is available to Rodriguez, there is substantial evidence to support the Board's conclusion that Rodriguez did not experience constructive discharge or, in the alternative, that he waited too long to seek a remedy.

"A decision to . . . retire is presumed to be voluntary." *Shoaf*, 260 F.3d at 1340. "As a general proposition, to establish involuntariness on the basis of coercion this court requires an employee to show: (1) the agency effectively imposed the terms of the employee's . . . retirement; (2) the employee had no realistic alternative but to . . . retire; and (3) the employee's . . . retirement was the result of improper acts by the agency."[12] *Id.* at 1341. The Board's conclusions appear to concede for the sake of argument that the record evidence satisfies the first and third prongs and thus the decision focuses on the alternatives to retirement that were available to Rodriguez in 1997. *See* Second Board Decision at 6, D.A. 118 ("As a result, given he had options to stay on the [Reserve Active Status List] in order to compete for promotion

---

[12]  In analyzing Rodriguez's constructive discharge claim, the Board articulated a legal standard that seems similar to the test contained in *Shoaf*. *See* First Board Decision at 35, D.A. 553 ("With respect to his voluntary retirement, a decision to retire is presumed to be voluntary. To overcome this presumption, an applicant must show one side involuntarily accepted the terms of another; the Soldier was left with no other alternative; and the circumstances leading to retirement resulted from coercive acts by the [New York Guard] leadership.").

without remaining in the [New York Guard] and subjecting himself to this adverse command climate, his transfer to the Retired Reserve was in fact a voluntary action."). Rodriguez therefore had the burden of showing that those alternatives were not truly available to him.[13]

---

[13] Rodriguez argues that the Army had the burden of proving that his retirement was not involuntary by clear and convincing evidence. *See* Pl.'s Resp. at 16–17 (citing 5 C.F.R. § 1209.4(d)). That regulatory subsection contains definitions of terms for the regulations governing appeals to the Merit Systems Protection Board in whistleblower cases (and, in fact, subsection (d) was redesignated as subsection (e) in 2013, *see* Merit Sys. Protection Bd. Practices & Procedures, 78 Fed. Reg. 39,543, 39,547 (Jul. 2, 2013) (adopting interim rule), *adopted as final* 78 Fed. Reg. 56,811 (Sep. 16, 2013) ). The regulation more relevant in this case is 5 C.F.R. § 1209.2(e) (also added in 2013, *see* 78 Fed. Reg. at 39,544):

> (e) Elements and Order of Proof. Once jurisdiction has been established, the merits of a claim of retaliation for whistleblowing or other protected activity will be adjudicated as follows:
>
> > (1) The appellant must establish by preponderant evidence that he or she engaged in whistleblowing or other protected activity and that his or her whistleblowing or other protected activity was a contributing factor in a covered personnel action. An appellant may establish the contributing factor element through circumstantial evidence, such as evidence that the official taking the personnel action knew of the disclosure or protected activity, and that the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure or protected activity was a contributing factor in the personnel action.
> >
> > (2) If a finding has been made that a protected disclosure or other protected activity was a contributing factor in one or more covered personnel actions, the Board will order corrective action unless the agency demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure or activity.

Rodriguez did not appear before the Merit Board, and he has provided no justification for imparting the Merit Board's legal standards into a military context. But even assuming that the Army was required to "demonstrate[] by clear and convincing evidence that it would have" processed Rodriguez's retirement in the absence of his whistleblowing, *id.*, that showing would still not undercut the Board's conclusion that Rodriguez could not demonstrate constructive discharge because he had alternative paths to remaining in the Army Reserve but instead chose to resign. That's in part because the standards of § 1209.2 only apply to the personnel actions listed in 5 U.S.C. § 7512, such as removals, suspensions for more than fourteen days, reductions

Having reviewed each of the supporting letters Rodriguez submitted to the Board, the Court concludes that substantial evidence supports the Board's (and therefore Penrod's) decision that Rodriguez had not made such a showing. Every letter praises Rodriguez's performance and ability and asserts that he would (and should) have been promoted to colonel had he been given the opportunity. *See, e.g.*, Brig. Gen. (ret.) Edward Klein's Ltr. (undated), D.A. 352–53 ("I believe that LTC Rodriguez would have been selected for Colonelcy and received evaluations that highlighted his fortitude and his value."); Maj. Gen. (ret.) Joseph J. Taluto's Ltr. of Oct. 8, 2011, D.A. 557–59 ("LTC Rodriguez . . . was not afforded the usual and reasonable services for those whose positions were downgraded [but who desired to continue to serve at a higher level], so in fact, he was forced to retire."); Maj. Gen. (ret.) John H. Fenimore's Ltr. of Oct. 14, 2011, D.A. 560–61 ("If LTC Rodriguez's official file, corrected to accurately reflect his actual manner of performance, had gone before the Colonel Selection Board, it is probable that he would have been selected for promotion in the spring of 1998."). But not a single letter discusses the availability of transfer from a paid billet in the New York Army National Guard to the Army's Individual Ready Reserve, a non-paid holding pool of officers who continue to earn credit towards retirement and compete for promotion even if not serving in an active job at that moment. 10 U.S.C. § 10144. Instead, each letter asserts that Rodriguez was in an untenable situation after having been placed in a position whose paygrade was downgraded from lieutenant colonel to major—a lieutenant colonel filling such a role would likely have been seen as

---

in grade, reductions in pay, or furlough longer than thirty days. *Id.* § 7512(1)–(5). Constructive discharge is a more nuanced legal theory that seeks to construe a seemingly non-adverse personnel action (retirement) as something more pernicious, and so it has its own burdens of proof as laid out in *Shoaf*. 260 F.3d at 1340. The Court analyzes the question under the *Shoaf* framework, in part for the reasons above and in part because Rodriguez himself suggests it.

underperforming and uncompetitive for promotion to full colonel. *See, e.g.*, Col. Sordi's Ltr. at 2, D.A. 563 ("If LTC Rodriguez had stayed in his downgraded position, he would have had no realistic opportunity for promotion selection."). Rodriguez asserted in this Court that "[t]he [Individual Ready Reserve] was not a realistic choice" because he was "only offered retirement, not any kind of counseling for the [Individual Ready Reserve]." Tr. of Mot. Hr'g ("Tr.") at 38:14–15, ECF No 32. But the record contains no evidence supporting that statement, especially given the fact that Rodriguez's signed retirement form indicates that he did have a choice. *See* DA Form 4187 at D.A. 236.

It is in this section of the Board's decision that its brief comments relating to the doctrine of laches have their greatest force. In concluding its analysis, the Board commented that Rodriguez's "choice to retire in 1997 limited his ability to recover on his own through his continued efforts and service. His choice to retire coupled with his decade-long delay in applying to the Board similarly limits his entitlement to relief. Under the doctrine of laches 'equity aids the vigilant and not those who slumber.'" Second Board Decision at 6, D.A. 118. Rodriguez objects to the invocation of laches, interpreting the remarks as an independent, alternative ground for denying relief despite the fact that he pursued and obtained a waiver for untimely filing.[14] *See* Pl.'s Mot. at 37 ("Once the [Board] discharged the statute of limitations imposed by Congress and granted partial relief, 'Laches cannot be interposed.'" (quoting *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 967 (2017)).

---

[14] The Court notes that the Board's waiver of the statute of limitations was partial and applied only to Rodriguez's request to remove the letter of reprimand from his record (discovered in 2005), not to this other requests for relief (known since the 1990s). First Board Decision at 3, D.A. 521. But the Department does not argue in this Court that the partial waiver of the limitations period forecloses Rodriguez's argument.

But it appears that the Board invoked laches to highlight the alternative way in which Rodriguez could have pursued relief. Rather than signing his retirement paperwork (even if he was being pressured into doing so), Rodriguez could have transferred to the Individual Ready Reserve and competed for promotion. Even if he were unsuccessful before the selection board because of the adverse materials contained in his record, he could have petitioned the Board to remove those materials (as he eventually did years later) and then been referred to a special selection board under 10 U.S.C. § 628 while still in active service. He also could have petitioned for relief immediately after retirement and sought reinstatement, but he chose not to do that either. *See* First Board Decision at 36, D.A. 554 ("Applicant failed to seek relief from his retirement in 1997 until 2005 even though he knew of the alleged errors (except for the [letter of reprimand]) the entire time[, and] . . . [h]e admits he intended to file an application in 1999, but *elected* not to because his civilian law practice 'heated up.'"); *see also* Brig. Gen. Klein's Ltr. at D.A. 352 ("Shortly [after Rodriguez's retirement], LTC Rodriguez and I had some preliminary discussions relating to his returning to the [New York Guard]. . . . However, the laborious process precluded rapid reintegration and we never put forth a final application.").

The Board's invocation of the term "laches" thus seems to be shorthand serving to criticize the long delay between the events of the late 1990s and Rodriguez's 2009 petition. The availability of alternative remedies at or shortly after the time of the alleged injury precluded the Board from disregarding the express terms of eligibility for retroactive promotion Congress laid out in 10 U.S.C. § 628. While the evidence in the record certainly provides a basis for finding that some Guard officials treated Rodriguez wrongfully, substantial evidence supports the Board conclusion that Rodriguez's desired remedy (retroactive promotion) was inappropriate in part because he did not meet the unambiguous criteria to qualify for such relief, and in part because

he waited so long to seek relief that other means of resolving the problem were no longer available to him. [15]

Under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 156). Penrod's short explanation of her decision, which incorporated and upheld the Board's reasoning, was adequate under that test. Even if the Court disagreed with her conclusion, the Court could not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### 3. The Court Could Not Grant Rodriguez's Preferred Remedy Even If It Were Warranted

A final note on remedies: Rodriguez strenuously argues that this Court should "[d]irect the Secretary of Defense . . . to provide the 'whole loaf' of relief to Rodriguez that is required based on the administrative record before this Court, including but not limited to, retroactive promotion to Colonel (retired)." Pl.'s Mot. at 45. He repeats that same language over and over again throughout his briefing, arguing that each alleged violation (however minor) entitles him to court-ordered promotion. *See, e.g.*, *id.* at 26 (requesting, in light of alleged due process violations, that "this Court . . . hold that Respondent acted arbitrarily, and in light of the fact that this matter has already been remanded once, direct that the Secretary of Defense . . . provide the

---

[15] Rodriguez asserts that because he *would* have been considered by the 1998 selection board had he still been in active service, the Court should find that he falls within the category of eligible officers. *See* Tr. at 39:1–13. But because he provides no legal justification for that argument and the text of the statute unambiguously refers to officers who were actually "considered," 10 U.S.C. § 628(b), the Court declines Rodriguez's invitation.

'whole loaf' of relief to Petitioner that is warranted by the administrative record before this Court, including retroactive promotion").

The Department correctly responds that this request fails to comprehend the nature of judicial review available under the APA and the separation of powers more broadly. Def.'s Mot. at 28. First, the APA authorizes courts either to "compel agency action unlawfully withheld or unreasonably delayed" or "hold unlawful and set aside agency action, findings, and conclusions" found to be defective under several criteria. 5 U.S.C. § 706. Rodriguez does not argue that the agency "unlawfully withheld" action it was otherwise required to accomplish, as he has already received an appealable final action. *Id.* § 706(1). And while he does contend that the agency "unreasonably delayed" the action, he characterizes that delay as "arbitrary and capricious" within the scope of subsection 706(2) rather than an ongoing delay that would require the Court to compel some action that has not yet occurred. Pl.'s Mot. at 31–32. Instead, he argues that, for all the reasons described above, Penrod's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . contrary to constitutional right, power, privilege, or immunity; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and/or] without observance of procedure required by law." *Id.* at 26 (quoting 5 U.S.C. § 706(2)). Therefore, the remedy available to him would be to "hold unlawful and set aside [the] agency action, findings, and conclusions." 5 U.S.C. § 706(2).

Neither the APA, nor the Military Whistleblower Protection Act, nor DOPMA, nor ROPMA authorizes courts to order specific relief of the kind Rodriguez desires. "Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards." *PPG Indus., Inc. v. United*

*States*, 52 F.3d 363, 365 (D.C. Cir. 1995) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 94–95 (1943)). "Not only [is] it unnecessary for the court to retain jurisdiction to devise a specific remedy to follow, but it [is] error to do so." *Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999). Thus, even if the Court were to accept one or more of Rodriguez's arguments, the most the Court could do would be to vacate Penrod's and Woodson's decisions and remand for reconsideration of Rodriguez's appeal.

Moreover, the Federal Circuit has repeatedly held that senior military officers are subject to the Constitution's Appointments Clause: the President must nominate them, the Senate must confirm them, and the President must appoint them before their promotions take effect. *Dysart v. United States*, 369 F.3d 1303, 1311–12 (Fed. Cir. 2004) (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 155–56 (1803)) (other citations omitted). In practice, the "President nominates officers from the promotion list provided to him by the military department, and those officers are confirmed by the Senate. In accordance with the Constitution, the President must then make a public act of appointment for an officer to be promoted." *Id.* at 1312; *see also* 10 U.S.C. § 624(b)(1) ("Appointments under this section shall be made by the President, by and with the advice and consent of the Senate."). The President may delegate his authority to appoint military officers to subordinate executive officials. *Orloff v. Willoughby*, 345 U.S. 83, 90 (1953). But under no circumstances may judicial officers exercise that authority or "order" executive officials to exercise their authority so as to effect any particular result. *See Adkins v. United States*, 68 F.3d 1317, 1324 (Fed. Cir. 1995) ("Adkins's prayer that the Court of Federal Claims direct the Secretary to promote him to the rank of colonel plainly was a request for impermissible 'interfere[nce] with legitimate Army matters.' Courts will not interject themselves into the

promotion process." (quoting *Orloff*, 345 U.S. at 94)).[16]  The appointment of Army colonels rests squarely with the Commander-in-Chief, not with judges, and this Court surely cannot order Rodriguez's retroactive promotion to such a position.  U.S. Const. art. II, § 2, cl. 1.

## V.    Conclusion

The Board acknowledged that Rodriguez was subjected to at least some retaliatory acts and it awarded partial relief to mitigate the effects of those acts.  But it declined to award some of the relief Rodriguez requested because it reasonably determined either that the alleged injuries Rodriguez sought to remedy were not themselves retaliatory or that the desired remedies were poorly matched to the alleged injuries and would have resulted in an undeserved windfall for Rodriguez.  Although the first two officials who handled Rodriguez's appeal to the Secretary of Defense may not have been properly appointed or qualified to do so, the Department cured any possible defect through the appointment of Assistant Secretary Woodson, who adopted Penrod's short but reasoned explanation and upheld the Board's conclusions.  The evidence in the administrative record, while mixed, provides more than enough of a basis to support Penrod's and Woodson's decisions, especially in light of the "strong but rebuttable presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith."  *Frizelle*, 111 F.3d at 177.  Rodriguez's alleged due process violations were, at most, harmless error and do not require vacatur.  Finally, the Court lacks the authority to grant Rodriguez the relief he desires, even if it were to agree with him on the merits of his case.

---

[16] In his response brief, Rodriguez seems to recognize that the court cannot promote him, but instead asks the Court "direct the Secretary of Defense . . . to provide the 'whole loaf' of relief to Petitioner that is required based on the administrative record that is before this Court, including retroactive promotion to Colonel (retired)."  Pl.'s Resp. at 23 (internal quotations omitted).  The Court sees little difference between ordering a promotion and ordering the Secretary of Defense to promote Rodriguez.

For the foregoing reasons, the Rodriguez's Motion for Summary Judgment is **DENIED** and Penrod's Motion for Summary Judgment is **GRANTED**.  An Order will be entered contemporaneously with this Memorandum Opinion.

DATE:  February 11, 2020

CARL J. NICHOLS
United States District Judge